**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| KAREN DARRING  and | ) | |
| THERESA BREWTON | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 05-112-BH-M |
| | ) | |
| DAILYACCESS CORPORATION | ) | |
| | ) | |
| Defendant | ) | |

**ORDER**

This matter is before the Court on Defendant DailyAccess Corporation's (hereinafter, "DAC") Motion (Doc. 32) for Summary Judgment.  Plaintiffs Karen Darring (hereinafter, "Darring") and Theresa Brewton (hereinafter, "Brewton") have Responded (Doc. 37) and DAC has filed a Reply (Doc. 46) to Plaintiffs' Response.  In addition, Defendant has filed a Motion (Doc. 45) to Strike certain affidavits submitted by Plaintiffs.  Again, Plaintiffs filed a Response (Doc. 47) to the Motion to Strike and Defendant Replied (Doc. 48) to Plaintiffs' Response.  Based on the above pleadings and all relevant evidence submitted therewith, the Court finds that Defendant DAC's Motion for Summary Judgment is **due to be GRANTED in Part and DENIED in Part**.  The Court also finds that Defendant's Motion to Strike is **due to be DENIED**.

**FACTS**[1]

***DailyAccess Corporation***

1.    DailyAccess Corporation (DAC) is a corporation organized and existing in the State of

---

[1] All facts, unless otherwise noted, have been drawn from the parties' Joint Pretrial Order (Doc. 57).  Due to the fact that the parties could only agree on four facts, the Court will view facts submitted by both sides as true unless directly disputed or otherwise evidenced as false.

Alabama.

2.      DAC provides record keeping and administration services for 401(k) and other qualified

retirement plans.  Its clients are companies that either maintain or sponsor these plans.

3.      DAC has a FMLA policy that allows its employees up to twelve weeks of unpaid leave for

a FMLA-qualifying event.  It requires employees to exhaust all available paid leave before

beginning unpaid FMLA leave.

4.      It violates DAC's policies and procedures to reprimand an employee for taking FMLA leave.

5.      DAC also has a Paid Time Off (hereinafter, "PTO") Policy in which employees are eligible

to earn 10 hours per month of PTO in lieu of vacation and/or sick days.

6.      DAC has an e-mail policy (Section XV of DAC's Employee Handbook) that governs DAC

employees' use of the company e-mail system.  It provides that "[e]-mail should not be used

to communicate sensitive or confidential information." Section 5 of the E-mailPolicy,

entitled "Confidential Information," provides that:

> All employees are expected and required to protect DAC's trade secrets and other
> confidential information. Company trade secrets or confidential information should
> never be transmitted or forwarded to outside individuals or companies not authorized
> to receive the information. Employees must use greater care when transmitting DAC
> trade secrets using e-mail than with other communication means because e-mail
> makes it easier to redistribute or misdirect trade secrets to unauthorized individuals.
>
> ****
> E-mail is an inappropriate method of communicating certain types of confidential
> information. Employees should consult their supervisor and the systems
> administrator before e-mailing sensitive or confidential information.
>
> The e-mail policy provides that violations of the policy can lead to an employee's discharge.

7.      DAC requires all of its employees to sign "Agreements Regarding Trade Secrets" that

require employees to maintain the confidentiality of DAC's trade secrets.

8.      The agreement signed by Darring provides, *inter alia*, that, "[a] trade secret includes . . .

confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any DAC business which is secret and of value."

9.   DAC views its client list as its premier trade secret.

10.   DAC's client list contains the names of DAC's clients, the identities of the brokers managing the plans (who are often DAC's primary contacts with the clients), and the sizes of the clients' retirement plan assets.

11.   Defendant contends, if a competitor of DAC obtained this list, it would have a blueprint for soliciting DAC's clients and could irretrievably damage DAC's business.

12.   Greg Wood is the Chief Operating Officer at DAC.

13.   On July 31, 2001, Jim Anderson was hired by DAC as Director of Client Services.  At all times relevant to this action, Wood was responsible for supervising Anderson.

14.   Since January 3, 2003, matters related to DAC's human resources have been handled by A.J. Bowab, DAC's Director of Finance.  Until July 2003, Bowab was supervised by Wood. After July 2003, Bowab was supervised by Carl Dekle, DAC's Chief Financial Officer.

15.   In 2003, Jim Anderson was responsible for hiring Account Executives.

16.   In January 2003, Anderson restructured the Account Executives program, dividing accounts based upon the size and/or complexity of the management plan.  The plans were divided among the Account Executives who were placed in three groups:  Team Select, Mid-Market, and Senior Account Executives.  Anderson and Wood determined the management level and clients each Account Executive was assigned.

17.   Prior to the reorganization, Account Executives each had a mishmash of plans and there was no real system as to how plans were assigned.  The reorganization was intended by Anderson to stratify client services to focus attention on the clients that needed the most attention.

18.  Team Select was a group of individuals who jointly managed small market plans valued at two million dollars and under.  These plans typically have a low-to-medium participant count with few complicated design issues.  Team Select was an entry level training position.

19.  Team Select Account Executives communicate with plan sponsors via telephone and e-mail.

20.  Darring was assigned to Team Select on January 1, 2003.

21.  Darring's pay and benefits were unaffected by her assignment to Team Select.

22.  Joe Bernardo was hired by DAC in March, 2002.  Bernardo had an accounting degree, but no experience specific to 401-K plans.  Bernardo was hired at $28,500 and paid an annual salary of $29,640 as an Account Executive assigned to Team Select in 2003.

23.  Kimberly Edwards, Charlene Makler, Pam McKinney (supervisor), Angie Jones, Daphne Reiser and Jennifer VanLandingham also served as Team Select Account Executives in 2003.

24.  The Mid-Market Account Executives handled plans valued at two million to ten million dollars. Account Executives placed in the Mid-Market division have no supervisory responsibilities.  However, if they obtained enough experience, then DAC may allow them to travel to the client location.

25.  For Mid-Market Account Executives, Anderson preferred (but did not require) a college degree, prior relevant job experience, and pension designation.

26.  Warren Meeker and Jason Turk were hired in 2002 and were Mid-Market Account Executives.

27.  Joe Bernardo was promoted from Team Select to Mid-Market Account Executive in August 2003.

28.  Lisa DiBenedetto also served as a Mid-Market Account Executive in 2003.

29.   The Senior Account Executives handled large plans that were valued at ten million and above, benefit plans with large numbers of participants, or benefit plans with complex design issues.  Travis Trujillo, Patricia Nier, and Tommy Smith were classified as Senior Account Executives in 2003.

30.   Senior Account Executives travel to clients to do presentations on behalf of DAC and they also assist in training the Mid-Market and Team Select Account Executives.

31.   For Senior Account Executives, Anderson preferred persons with college degrees or experience dealing with larger clients and pension designation.

### *Theresa Brewton*

32.   Theresa Brewton was hired by DAC in 1997 as an Executive Secretary.  In 1998, DAC assigned Brewton to supervise the employees in the mail room.

33.   In 2001, Brewton was promoted to the position of Call Center Supervisor.  As the Call Center Supervisor, Brewton supervised the Call Center Department.

34.   In September 2002, Brewton requested FMLA leave due to a serious medical problem. Brewton requested and received Family Medical Leave, three weeks full time and three weeks part time, due to scheduled hysterectomy surgery.

35.   On May 14, 2003, Brewton claims she requested medical leave for testing due to a serious health problem.  DAC denies that Brewton made any such request.

36.   On May 15, 2003, Anderson terminated Brewton's employment.  Brewton was advised that her position had been eliminated. Anderson allegedly stated to Brewton, "I've been meaning to do this for some time, but decided to do it now since you have been out so much."

37.   DAC alleges neither Brewton's frequent absences nor any other reason apart from the low call center volume played a part in the decision to eliminate the Call Center Supervisor

position, and thus discharge Brewton.

38.     Several months after Brewton was discharged, DAC decided to expand its call center operations. Call center employees began taking transactions over the phone, such as handling pension plan reinvestment and allocation strategies and had their own accounts. DAC determined that the call center again needed a supervisor to manage the call center employees in their performance of these expanded duties.

39.     On October 13, 2003, DAC hired Tammi Porter as the Participant Service Center Supervisor.

40.     Tammi Porter was hired to manage the call center in late 2003, but with expanded responsibilities from when Brewton was the call center supervisor.   Only half of Porter's time was to be spent supervising the call center; the remainder of her time was to be spent training to be a Senior Account Executive.  DAC claims that no one has ever been rehired to supervise the call center with the same responsibilities Brewton had at the time she was discharged.

41.     Brewton was scheduled to receive off-site training by DAC one week before her termination.

42.     Brewton alleges, Anderson made comments to her that he did not like "working with all these women" and "with all these women, it has to be somebody's time of the month all the time."  Anderson also supposedly stated to Brewton, "What's wrong? Is it your time of the month."

***Karen Darring***

43.     DAC hired Plaintiff Darring as a Client Service Specialist on or around December 26, 2000. She became an Account Executive in 2001.

44.     Darring has taken a few classes through the University of Alabama's distance learning program, but does not have a college degree.  When hired by DAC, Darring did not have any

experience working with benefit plans.  In 2002, Darring failed the C-1 examination, the first examination required by the American Society of Pension Actuaries to be designated as a Qualified 401(k) Plan Administrator.

45.   Darring was assigned to assist Christina Simoni, her supervisor, with the Legg Mason Account which was valued at approximately ten million dollars.

46.   Simoni directed Darring to prepare a tracking spreadsheet of customer accounts for herself and other Account Executives.  Simoni was aware and authorized Darring to e-mail the DAC customer list to her home to prepare the tracking spreadsheet.

47.   In November 2001, Darring was assigned to manage the Legg Mason account without Simoni's assistance. Darring's salary was increased to $25,000.

48.   On June 10, 2002, Darring received a salary increase to $25,750.00.

49.   Darring experienced problems with her pregnancy and was placed on maternity leave by her treating physician on September 10, 2002.

50.   On November 18, 2002, Darring returned from maternity leave.  Darring was notified upon her return from maternity leave that all large accounts she managed were transferred to other Account Executives.

51.   In January 2003, Darring was placed on Team Select as an Account Executive.

52.   On February 3, 2003, Darring received a salary increase to $26,780.00.

53.   After Darring returned from maternity leave, she requested additional PTO leave due to the serious medical needs of her children and herself.  Darring turned in a doctor's excuse each time she requested PTO leave. There were only two occasions (the funerals of family members) that Darring requested leave that was not related to the serious medical needs of either herself or her children.

54. Anderson allowed Darring to exceed her allotment of PTO.

55. Anderson also alleges that he encouraged Darring to take FMLA leave, but she stated that she did not want FMLA leave because it was unpaid.

56. Anderson also admits telling Darring that if she was unwilling to take FMLA leave, then she needed to be at work.

57. Darring was once disciplined for an e-mail she wrote about a client's employee, which included a statement about the client having to pay a fee for its employee's stupidity. The client inadvertently received a copy of this e-mail, and was upset.

58. Darring supposedly often asked, "what does someone have to do to get fired around here."

59. On July 29, 2003, Darring received a reprimand for excessive absenteeism.  Darring was advised that any further absences would result in her termination.

60. In July 2003, Darring advised her supervisor, Pam McKinney, that she believed the July reprimand to be "unfair" because the absences were taken due to family illnesses and/or the birth and care of her newborn child. Darring notified the Human Resource Officers, Bowab and Dekle, that she believed the reprimand violated her rights under the FMLA. Darring requested that Bowab review the status of her leave requests to determine if any of her absences were covered leave under the FMLA.

61. On or about August 2003, Darring e-mailed DAC's client list to her home in order to prepare a tracking spreadsheet.

62. On September 15, 2003, Darring allegedly complained to Carl Dekle, Human Resource Officer, regarding the discriminatory conduct of Anderson and concerns that her July 2003, reprimand violated the FMLA. Darring provided notice to DAC of a potential FMLA leave request and expressed concerns that she may be terminated.

63.     On September 16, 2003,[2] Jim Anderson terminated Darring's employment with DAC. Darring was advised that she was terminated for violation of the e-mail policy.

64.     DAC asserts that although Darring's absenteeism and performance were significant issues, she was discharged solely because she violated DAC's e-mail policy.

65.     All of DAC's employee e-mail accounts are monitored periodically by Judy Godfrey, DAC's Systems Administrator.  Godfrey noticed that Darring had sent a large number of e-mails to her personal account.  These e-mails included internal company policies, as well as DAC's entire client list.

66.     DAC claims, any project that required Darring to send their client list to her home e-mail account would have been assigned by Anderson or Pam McKinney, her supervisor.  Neither assigned her any such project.

67.     DAC states that it was the unanimous decision of DAC's management that Darring be discharged immediately for e-mailing the client list to her home.

68.     Darring asserts that she received express permission to e-mail the client list to her home the first time in 2001 by her supervisor Christina Simoni.  Since 2001, Darring claims that she had generated several tracking sheets at home for herself and other Account Executives at DAC.  She further claims that her supervisors had knowledge that she e-mailed the client list to her home to generate the tracking document.  Darring also contends that she advised Jim Anderson, her supervisor, that she e-mailed the DAC customer list to her home to prepare a tracking spreadsheet. In fact, she alleges Jim Anderson's secretary, Lindsay Weaver, had e-mailed the client list to Darring's home e-mail address to assist Darring in her task.

69.     Simoni left DAC in 2002, over a year before Darring was discharged.  DAC claims that

---

[2] Defendants claim Darring's date of discharge to be September 18, 2003.

Simoni was never authorized to grant Darring permission to send the DAC's client list to her home e-mail account.

70.     DAC states that when confronted with the client list she had e-mailed to her home, Darring said she was working on some sort of list for work.  Darring was supposedly asked if Anderson or McKinney told her to do that.  Darring allegedly said she did it on her own.

71.     Darring also claims that other DAC employees have taken confidential documents off premises without being reprimanded and/or terminated.

72.     Darring claims that DAC did not have a written policy which prohibited e-mailing confidential documents at the time of Darring's termination. Confidential information was customarily transferred via e-mail including, but not limited to, social security numbers, Federal ID numbers, customer names, addresses, and other personal information regarding client plans.

73.     DAC's asserts that its employees were frequently warned as to the importance of keeping confidential the company's trade secrets.

74.     The firing of Patricia Duke in 2002 was purportedly announced in a company-wide meeting attended by all DAC employees, including Darring.  At this meeting, it was allegedly announced that Duke had been had been fired for sending e-mail and the company client list to an outside person.

75.     Following Duke's discharge, Gregg Wood periodically sent out e-mail reminders to all DAC employees reminding them of the importance of not sending confidential or company information via e-mail.

76.     Anderson noted on the termination Processing Checklist that Darring was "Fired for release of confidential info out of DAC to 3rd party."

77.   At Darring's Unemployment Compensation Hearing DAC asserted that Darring violated the Agreement Regarding Trade Secrets.  DAC never produced or asserted that Darring violated an e-mail policy.

78.   On March 8, 2004, Darring filed a charge of discrimination with the EEOC.[3]

## LEGAL ANALYSIS

### *Summary Judgment Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir. 2004) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*  A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*

The moving party bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party may discharge its

---

[3] Defendants assert that thee EEOC charge was filed on March 2, 2004.

"initial responsibility" by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991). To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must then come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences ... in his favor." *Four Parcels*, 941 F.2d at 1428 (internal quotations and citations omitted).

***Plaintiffs' Claims***

Plaintiffs Darring and Brewton filed suit in this Court in February, 2005. Count I of the Complaint alleges that DAC interfered with Plaintiffs' rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 *et seq.* (hereinafter, "FMLA") by reprimanding Darring and terminating both Darring and Brewton for statutorily protected activity. In addition, Counts I and V espouse Plaintiffs' claims that DAC retaliated against them for seeking FMLA leave and objecting to what Darring believed to be violations of the FMLA. Count II proffers Plaintiff Darring's claim of discrimination under the Equal Pay Act, 29 U.S.C. §206 (hereinafter, "EPA"). In Count III, Darring asserts compensation discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq.* (hereinafter, "Title VII"). In Count IV Plaintiff Darring contends that she was terminated in retaliation for statutorily protected activity in violation of the EPA and Title VII.

## I.      FMLA

The FMLA provides an eligible employee the right to take up to 12 workweeks of leave

during any 12-month period for the birth of that employee's child, for the care of that employee's family member or because of a serious health condition. 29 U.S.C. §2612(a)(1). Further granted is the right of such employees "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. 29 U.S.C. 2614(a)(1). In order to protect these rights, the FMLA has made it unlawful for employers "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. §2615(a)(1). In addition, employers are prohibited from discharging or otherwise discriminating against individuals either opposing practices made unlawful under the FMLA or employees utilizing their FMLA leave. *See* 29 U.S.C. §2615(a)(1) & (2); 29 C.F.R. §825.220(c). Though not clearly delineated under the FMLA, it has been clearly recognized in the Eleventh Circuit that §2615 creates two types of claims: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 2006 WL 345823, at *5 (11th Cir. 2006) (citing *Strickland v. Water Works and Sewer Bd. Of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)). Though separate claims, they may be brought simultaneously. *See Strickland*, 239 F.3d at 1207 (holding that the district court erred by construing claim solely as a retaliation claim where plaintiff claimed his termination while on leave constituted both retaliation and a denial of his right to reinstatement under the FMLA); *See also Ashe v. Aronov Homes, Inc.*, 354 F.Supp.2d 1251, 1264 (M.D. Ala. 2004). In the instant case, despite Defendant DAC's contentions to the contrary, the Court finds that Plaintiffs do allege both types of claims under the FMLA.

### A.      Darring and Brewton's Claims of Interference under the FMLA

In order to establish a claim of interference, the employee must only demonstrate beyond a preponderance of the evidence, without regard to the intent of the employer, that they were entitled to the benefit interfered with or denied.  *Strickland*, 239 F.3d at 1206-07; *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353 (11th Cir. 2000).  In the case *sub judice*, Plaintiffs seem to assert that the benefit interfered with or denied was the leave itself and that their termination was DAC's act of interference or denial.  (Pls.' Br. Opp. Mot. Summ. J. at 6; Compl. at ¶¶ 29 & 35).  However, there is some indication that Plaintiff Darring is also asserting that the verbal and written reprimands she received in June and July, 2003 amount to interference with her rights under the FMLA.  (Compl., ¶ 26).[4]  The Court will examine all of these instances to determine whether interference occurred

### 1.      Plaintiffs Darring and Brewton's Terminations

Termination clearly interferes or denies an employee the benefit of being able to utilize FMLA leave.  Therefore, in order to establish a claim for interference under the FMLA, Plaintiffs must demonstrate that they were entitled the leave they requested.  Plaintiff Brewton claims that on May 14, 2003 she requested medical leave for testing due to a serious medical problem.  (Pls. Resp. Def. Undisp. Statement of Facts, ¶ 35).  Plaintiff Darring alleges that on September 15, 2003, she expressed concern that her July 2003 reprimand violated FMLA and notified DAC of a potential FMLA leave request.  *Id.* at ¶60.  As Plaintiffs have cited in their pleadings, the Court does not deny that Federal regulations establish that it is the employer's burden to ascertain whether requests for

---

[4] Though Brewton has noted several instances in which Anderson allegedly reprimanded her for taking FMLA leave or pressured her to return from FMLA leave (*See* Pls. Resp. Def. Undisp. Statement of Facts, ¶¶ 27, 29, 31, 32, 33),  there is nothing in the Complaint asserting a claim based on these incidents.  Therefore, the Court cannot consider a claim of interference based on any of these alleged reprimands by Anderson towards Brewton.

leave actually qualify for FMLA protection.  29 C.F.R. §825.303(b).  However, we do note that such regulations are in reference to the propriety and sufficiency of an employee's notice of FMLA leave. *See, e.g., Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1434-35 (11th Cir. 1997) (where there was no dispute that Plaintiff had a serious medical condition, only whether her notice was sufficient to invoke FMLA leave).  In the instant case, however, the sufficiency of Plaintiffs' notices are not in dispute.  Rather, Defendant DAC simply challenges whether Plaintiffs have shown that they (or a qualifying family member) suffered from a "serious medical condition" making them eligible for the rights and benefits under the FMLA.  Based on the standard set forth in *Strickland*, we find that the burden is on Plaintiffs to demonstrate FMLA eligibility when asserting claims of interference. In this matter, Plaintiffs have offered no medical reports, documentation or evidence, other than their own assertions, that could indicate to this Court that they were entitled to the FMLA leave they claim was interfered with by their termination.  Therefore, the Court finds that Plaintiffs have not established a claim for interference under the FMLA.

## 2.    Plaintiff Darring's Reprimands

Plaintiff Darring alleges in the Complaint that she was verbally reprimanded on or about June 27, 2003 for excessive absenteeism.  (Compl., ¶ 23).  She further contends that she was again reprimanded, in writing, for this same reason about a month later.  *Id*. ¶24.  29 C.F.R. §825.220 defines "interfering with" as "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  The Court is faced with the questions of whether DAC's alleged actions amount to interference and whether such interference, if it existed, disrupted Darring's rights or benefits under the FMLA.  The Court concludes that DAC's actions did not interfere with any such rights.

Though the reprimands discouraged Darring from missing any further work, there has been

no evidence presented that such reprimands were related to any FMLA leave sought by Plaintiff. In fact, the July 29, 2003 letter of written reprimand specifically references only Darring's excessive use of PTO. "As of July 29, 2003, Karen has missed a total of 134 hours of work time, which is in excess of the 120 hours earned on an annual basis. Karen has maintained a negative Paid Time Off balance every month in 2003." (Doc. 37-14). Though Darring now asserts that all or most of the absences that make up her missed time in 2003 were legitimately related to family medical situations, DAC's letter in no way discourages her from taking FMLA leave. All the letter indicates is that Darring was not permitted to take any more PTO in 2003. The letter does not reference Darring's properly utilized FMLA leave for her pregnancy in 2002, nor could it have encompassed her alleged notice of FMLA leave in August 2003. Other than Darring's testimony that she requested Bowab to review these absences for FMLA eligibility *after the reprimands had already been issued*, there is no indication that Plaintiff ever attempted to obtain intermittent FMLA leave for these recurring medical situations in the first seven months of 2003 or that she even wanted FMLA leave. Rather, it is the testimony of Anderson that he encouraged Darring to take FMLA leave if necessary and she refused, citing that FMLA leave was unpaid. (Anderson Decl., ¶¶ 5 & 6). Without any evidence that Darring attempted to utilize any of the FMLA's rights or benefits regarding the medical situations in question prior to being reprimanded, the Court cannot find that any such rights were interfered with by DAC.

Based on the above analysis, the Court finds that Plaintiffs have not satisfied the evidentiary burden necessary to support a claim of interference in violation of the FMLA. Therefore, the Court holds that Defendant DAC's Motion for Summary Judgment, as it applies to **Plaintiffs' claims of interference under the FMLA, is due to be and hereby GRANTED**.

## II.      FMLA, EPA and Title VII - Retaliation Claims

In this matter, Plaintiffs Darring and Brewton allege that DAC retaliated against them, by terminating their employment, for exercising their rights under the FMLA.  In addition, Darring contends that her termination was also in retaliation for her exercise of rights under the EPA and Title VII.  Plaintiff Brewton asserts that she advised Anderson of a serious medical condition on May 14, 2003 and that she may have to take FMLA leave.  (Brewton Aff., ¶11).  Darring claims that she met with Carl Dekle on September 15, 2003 and indicated that she may have to take FMLA leave.  (Darring Aff., ¶22).  She also states, in that same meeting she expressed concerns to Dekle regarding the pay differentials between males and females, that Anderson was discriminating against females and that her reprimand in July violated the FMLA.  *Id.*

### A.      *Brewton - FMLA*

#### 1.      *Direct Evidence*

When a plaintiff alleges retaliation based on an illegally discriminatory motive, they may prove such retaliation through either direct or circumstantial evidence.  *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1191-92 (11th Cir. 1997) (utilizing a decisionmaker's statement as direct evidence of an employer's retaliatory intent for termination in violation of Title VII).  In the instant case, Brewton asserts, at her termination Anderson told her, "I've been meaning to do this for some time, but decided to do it now since you have been out so much."  (Brewton Aff., ¶ 13).   She contends that this statement is direct evidence of DAC terminating her, in violation of the FMLA, for asserting her rights under the FMLA.  Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption."  *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004))(internal quotations omitted).   Such evidence must demonstrate the existence of "a

discriminatory ... attitude correlating to the discrimination ... complained of by the employee."
*Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999).  In other
words, Plaintiff must show that the employment decision was *motivated* by plaintiff's exercise of
a statutorily protected right.  *Id*.  The Eleventh Circuit has held "only the most blatant remarks,
whose intent could mean nothing other than to discriminate on the basis of some impermissible
factor constitute direct evidence of discrimination."  *Wilson*, 376 F.3d at 1086.  If the Court finds
that the alleged statement merely "suggests, but does not prove, a discriminatory motive, then it is
circumstantial evidence."  *Id*.  In the instant case, the Court finds that Anderson's statement, if
actually made, does demonstrate that he ultimately terminated Brewton because she was seeking
leave under the FMLA.  Though Anderson denies that Brewton mentioned, prior to her termination,
that she may need FMLA leave, there is at least a genuine dispute of material fact as to DAC's
motives for terminating Theresa Brewton.   Therefore, Defendant DAC's Motion for Summary
Judgment is **due to be DENIED** as to **Brewton's claim of Retaliation in violation of the FMLA**.

### 2.        *Circumstantial Evidence*

Even if Anderson's statement is not viewed as direct evidence of an improper motive for
terminating Brewton, it may be considered as circumstantial evidence.  *Wilson*, 376 F.3d at 1086.
In pursuing a claim of retaliation under the FMLA without direct evidence of the employer's
retaliatory intent, plaintiffs must satisfy the burden shifting analysis prescribed in *McDonnell
Douglas v. Green*, 411 U.S. 792 (1973).  *Hurlbert*, 2006 WL 345823, at *9.  Initially, plaintiffs must
establish a *prima facie* case by demonstrating: "(1) [they] engaged in statutorily protected activity;
(2) [they] experienced an adverse employment action; and (3) there is a causal connection between
the protected activity and the adverse action."  *Id*.  (citing *Smith v. BellSouth Telecomms., Inc.*, 273
F.3d 1303, 1314 (11th Cir. 2001).  Once a prima facie case is established, the burden then shifts to

the defendant employer to proffer a legitimate and nondiscriminatory reason for the adverse employment action. *Id*. Plaintiffs are then required to rebut defendant's reasons with evidence that they are merely pretext. *Id*.

In regard to Plaintiff Brewton, the Court finds that she has clearly satisfied the prerequisite *prima facie* standard. She contends that she requested FMLA leave, she was terminated and such termination was causally connected to her request. Brewton's termination occurred only one day after she allegedly notified Anderson that she may need to take FMLA leave. "To prove a causal connection, we require a plaintiff only to demonstrate that the protected activity and the adverse action were not *wholly unrelated*." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). It is well established in the Eleventh Circuit that a plaintiff can satisfy the causal connection element by providing "sufficient evidence that the decision maker became aware of the protected conduct and that there was close temporal proximity between this awareness and the adverse employment action." *Id*. Brewton's testimony that she notified Anderson of her desire to take FMLA leave and subsequent firing only a day later demonstrates a causal connection and establishes a *prima facie* case of retaliation in violation of the FMLA.

In rebuttal to Plaintiff Brewton's *prima facie* case, Defendant DAC must only meet the "exceedingly light" burden of presenting a legitimate and nondiscriminatory reason for its employment action. *Perryman v. Johnson Products, Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983). In satisfying this burden, DAC indicates that Brewton was terminated because her position was eliminated for legitimate business reasons.

Brewton, however, contends that DAC's proffered legitimate and nondiscriminatory reason is merely pretext. To support this assertion, she evidences Anderson's alleged statement that he was terminating her because of absenteeism. Though his statement does indicate that he may have been

contemplating her termination prior to her request for FMLA leave, it equally demonstrates that his final decision was based on her absenteeism.  Furthermore, Amy James stated in her affidavit that Wood indicated to her that Brewton was fired because of her excessive absences.  (James Aff., ¶ 18). Even if the alleged statements of Brewton and Wood are not taken to indicate that Brewton was fired for exercising FMLA leave, rather because she was simply excessively absent, they still evidence a different reasoning for Brewton's termination than now presented by DAC.  Such shifting reasons, viewed in a light most favorable to non-movant Brewton, call into question the credibility of DAC's proffered legitimate and nondiscriminatory reason and create a genuine issue of material fact.  *See, Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193-95 (11th Cir. 2004) (reversing a judgment as a matter of law because employer's shifting reasons for terminating an employee damaged the employer's credibility and created the possibility that the jury could infer employee was fired for impermissible reason).  Therefore, Defendant DAC's Motion for Summary Judgment is **due to be DENIED** as to **Plaintiff Brewton's claim of Retaliation in violation of the FMLA**.

### B.    *Darring - FMLA, EPA and Title VII*

Like Brewton, Plaintiff Darring asserts a claim of retaliation in violation of the FMLA. However, unlike Brewton, she also asserts claims of retaliation in violation of the EPA and Title VII. Darring contends that she was terminated on September 16, 2003 as a result of and in retaliation for her conversation with Carl Dekle on September 15 expressing her concerns regarding possible gender discrimination in pay in violation of the EPA and Title VII, discrimination based upon the FMLA and a request for FMLA leave.

Darring has not proffered any direct evidence that DAC terminated her for the alleged discriminatory reasons.  Therefore, Darring's three claims for retaliation in violation of the FMLA, EPA and Title VII must be analyzed under the burden-shifting *McDonnell Douglas* analysis.  *See*

*Hurlbert*, 2006 WL 345823, at *9 (FMLA); *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342 (11th Cir. 2000) (EPA/FLSA); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (Title VII).

In order to establish a *prima facie* case under the *McDonnell Douglas* standard, Plaintiff must demonstrate (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Meeks v. Computer Assocs. Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994).[5] All three of Darring's retaliation claims stem from a single meeting with Carl Dekle, during which she engaged in statutorily protected activity by raising concerns about possible violations of the EPA, Title VII and the FMLA as well as notifying Dekle of a potential FMLA leave request. Since all of Darring's retaliation claims stem from the same events and must satisfy the same standard, we will examine them concurrently.[6] Darring claims that her disclosure on September 15, 2003 was the impetus for DAC terminating her position only one day later. As with Brewton, Darring's testimony regarding her conversation with Dekle and the close temporal proximity between that meeting and her subsequent termination establishes a causal connection between the two.

Rebutting Darring's *prima facie* claim of retaliation, DAC proffers that Darring was terminated for the legitimate and nondiscriminatory reason of violation of company e-mail policy. More specifically, Defendant asserts that Darring e-mailed DAC's client list to her home account

_____

[5] Plaintiff must satisfy the same elements to establish a *prima facie* case of FMLA, EPA or Title VII violation. *See Hurlbert*, 2006 WL 345823, at *9; *Wolf*, 200 F.3d at 1342-43.

[6] Though Darring seems to make some indication in her Brief in Opposition to Defendant's Motion for Summary Judgment that she is asserting a claim of retaliation for DAC's reassignment of her work, denial of promotions and assignment of entry level work as a result of her taking FMLA leave for her pregnancy (Doc. 38 at 9-10), her Complaint does not contain any such claim. Therefore, the Court will not consider a claim of retaliation for any actions Darring claims occurred as a result of her taking FMLA leave for pregnancy in late 2002.

without permission from her supervisors.  Such information, DAC contends, is the company's premier trade secret and there was no legitimate function of her position that would entail Darring e-mailing it to her home account.

In an effort to establish DAC's legitimate and nondiscriminatory reason as pretext, Darring cites several pieces of circumstantial evidence.  First, Darring alleges that there are inconsistencies in DAC's proffered reasons for her termination that create a genuine issue of material fact.  Supporting this contention, Darring points out that DAC has proffered her violation of the company e-mail policy as the legitimate and nondiscriminatory reason for her termination.  However, Darring evidences that DAC reported to the EEOC and Unemployment Compensation Officer that she was terminated for violating the Trade Secret Agreement and noted on her termination record that she was fired for "release of confidential info out of DAC to 3rd party."  Though these reasons are not identical, the Court does not find that they are inconsistent or contradictory.  Rather, based on the importance DAC places on their client list, the relevant portions of DAC's Trade Secret Agreement and e-mail policy provided to the Court seem to work conjunctively to prevent improper disclosure of this information to outside parties.  Though the reasons for Darring's termination have not been characterized identically, the Court does not find them so incompatible as to lead a rational trier of fact to question the credibility of DAC's now proffered legitimate and nondiscriminatory explanation.

Plaintiff also claims that Defendant's reasoning for firing her was pretext because the e-mail policy was not strictly enforced by DAC and that other employees violated the same policy without repercussion.  DAC has an e-mail policy contained in its employee handbook providing that e-mail was not to be used to communicate sensitive or confidential information and Darring clearly violated this policy by transmitting DAC's client list to her home computer via e-mail.  DAC acknowledges

that some exceptions to this policy were made, but only with the express permission of management. In addition, DAC notes that it had enforced this policy in 2002 when it was forced to discharge Patricia Duke.  The termination of Duke resulted in DAC management's further emphasis of the e-mail policy.  Darring also attempts to assert that she obtained permission to send the type of e-mail at issue from Christina Simoni.  However, Simoni had given her this permission in 2001,  had since left DAC and was no longer Darring's supervisor.  DAC simply claims that it fired Darring because she e-mailed confidential information off premises without permission and that the e-mail had no legitimate function of her position.  The only evidence to support the contention that e-mail policy was not strictly enforced are the affidavits of Darring, Brewton, Duke and James.  Though these affidavits assert that the e-mail policy was not strictly enforced and that many employees took work home, what is conspicuously absent is any indication that these employees did not have permission or were not performing a legitimate function of their position.  Therefore, the Court finds Darring's general assertion that the company's e-mail policy was not strictly enforced to be unpersuasive in establishing DAC's legitimate and nondiscriminatory reason as pretext.  As a result, the Court holds that Plaintiff Darring has failed to satisfy her burden under the *McDonnell Douglas* standard and Defendant DAC's Motion for Summary Judgment is **due to be GRANTED in Part** as to Plaintiff Darring's claims of **Retaliation** in violation of the **FMLA, EPA and Title VII**.

### III.     EPA - Discrimination

As an amendment to the FLSA, the EPA is "directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages."  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992).  Pursuant to the EPA, an employer must not pay employees of one sex at a rate lower than employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are

performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. §206(d)(1). As indicated by the statutory language, "[a] plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed similar work for less pay." *Miranda*, 975 F.2d at 1526.  However, if a plaintiff can make such a showing, then the burden shifts to the employer to demonstrate by a preponderance of the evidence that the pay differential was permissible under one of the four exceptions enumerated in the statute.  *Id*.; *see Meeks*, 15 F.3d at 1018.

In order to analyze whether a plaintiff and her comparators performed similar work, the Court notes,  "[j]obs held by employees of opposite sexes need not be identical; rather, they need only be substantially equal."  *Miranda*, at 1532.   In other words, we are to be guided by the responsibilities, tasks and demands of the *jobs*, not the *qualifications* of the individual employees holding those jobs.  *Id*. at 1533.   Darring specifically names male employees Jason Turk, Sean Porter, Warren Meeker and Joe Bernardo as being comparators for the purpose of determining equal pay. (Pls.' Br. Opp. Def.'s Mot. Summ. J. at 17).  Though Plaintiff's title at DAC was Account Executive, it is clear that not all Account Executive positions were substantially similar.  At the beginning of 2003, DAC reorganized its Account Executives based on the size of the plans administered.  Team Select Account Executives handled benefit plans with values of less than $2 million.  DAC describes these plans as low-to-medium participant count with few complicated design issues.  They communicate with clients primarily via telephone and e-mail.  Account Executives for Mid-Market accounts handle plans between $2 million and $10 million and these plans may contain some complex design issues.  DAC, also may permit these Account Executives to travel to client locations.  DAC asserts that it gives Mid-Market Account Executives greater

responsibilities and expects them to perform at a higher level than Team Select members.  Senior Account Executives deal with benefit plans with values in excess of $10 million.  These plans, according to DAC, have a large number of participants or complex design issues.  Account Executives designated to these accounts travel to clients to do presentations and assist in training Mid-Market and Team Select account executives.

Despite DAC's differentiation between the duties and responsibilities of Team Select and Mid-Market Account Executives, Plaintiff Darring contends that these jobs are substantially similar.  However, the only evidence to support this contention is her own opinion.  Without more, the Court cannot find Plaintiff's unsubstantiated belief alone is enough to satisfy the Eleventh Circuit's strict standard of demonstrating the substantial similarity of the jobs.  Though the Court does not find that any of Mid-Market Account Executives are proper comparators for Plaintiff's EPA claim, Joe Bernardo, while he was a Team Select Account Executive, does fit the bill.

While Bernardo was a Team Select Account Executive, until August 2003, he was paid annually about $3,000 more than Darring.  Therefore, DAC bears the burden of demonstrating that the pay discrepancy falls within one of the four statutory exceptions.  In the instant case, DAC seems to assert that the disparity is a result of the combination of merit and factors other than sex.[7] Anderson testified that it was his subjective opinion that Bernardo performed his job better and has good customer service and communication skills.  Furthermore, Bernardo has an financial degree and a background in financial services.  Darring, in contrast, has no college degree or any background in the financial industry.  Also, in 2002 Darring failed the C-1 examination which is the

---

[7] Factor other than sex exception applies when the disparity results from unique characteristics of the same job; from the individual's experience, training or ability; or special exigent circumstances connected with the business.  *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988).

first part of the examination required by the American Society of Pension Actuaries to be designated as a Qualified 401(k) Plan Administrator.  Darring, however, contends that her experience with the Legg Mason account and Anderson's chauvinistic comments undercut DAC's evidence that the pay discrepancy was based on statutorily permissible reasons.  The Court does not agree.  Though Anderson's comments may have been tasteless or inappropriate, they were not made in a hiring or promotional scenario and do not necessarily indicate a belief that men should receive a higher rate of compensation than women.  Furthermore, though Darring's experience with the Legg Mason account is certainly in her favor, the Court finds DAC's showing of Bernardo's education and financial background, in combination with Darring's lack thereof, as sufficient evidence to satisfy their burden to demonstrate that the pay differential was statutorily permissible.  Though Plaintiffs submit much evidence outlining pay differentials between various other employees at various other positions, the Court is only concerned with the claims of pay discrimination asserted in the Complaint.  In this matter, only Darring has raised the issue of violation of the EPA and only to the extent that *she* was discriminated against.  The propriety of the wages earned by other employees within DAC has not been raised in this matter and will not be addressed by the Court.

Defendant's Motion for Summary Judgment as to **Plaintiff Darring's claim of Discrimination in violation of the EPA is due to be GRANTED**.

### IV.     *Title VII - Disparate Treatment*

Among Title VII's protections is the provision that no employer may discriminate against an employee with respect to their compensation based on that employee's sex.  42 U.S.C. §2000e-2(a)(1).  As with the retaliation claims we have already considered, individual disparate pay claims brought under Title VII are governed by the burden-shifting framework put forth in *McDonnell Douglas.  Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1185 (11th Cir. 2005)

(citing *Miranda*, 975 F.2d at 1528).[8]  Under the *McDonnell Douglas* rubric, "a female Title VII

plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job

similar to that of higher paid males." *Id*.  If plaintiff satisfies this requirement, then the burden of

persuasion is shifted to defendants to articulate a legitimate and nondiscriminatory reason for the

pay disparity.  *Id*.  "Once such a justification is advanced, the plaintiff must demonstrate beyond a

preponderance of the evidence that the employer had a discriminatory intent."  *Id*.

As in her EPA claim, Darring asserts that she occupied a similar job to that of Jason Turk,

Joe Bernardo, Travis Trujillo, Sean Porter and Warren Meeker.  Though the Title VII standard

regarding job similarity is more relaxed than the EPA standard, the Court does not find that Plaintiff

held a position that was sufficiently similar to any male employee other than Joe Bernardo.  In

response to Plaintiff's *prima facie* case, DAC submits that Bernardo had superior education,

experience and professional qualifications as legitimate and nondiscriminatory reasons for the pay

disparity.  Without delving into the issue of whether Darring's Title VII claims are timely regarding

the pay disparity between herself and Bernardo, the Court finds that she cannot establish a genuine

issue of material fact as to whether DAC's legitimate and nondiscriminatory explanation is pretext.

Darring first attempts to demonstrate pretext by contending that the assignment of employees

to different classifications based on the types of accounts administered was subjective and only

served to perpetuate pay disparity.  However, the Court does not see how this is possible since it is

clear that there is a mixture of male and female employees at each account level.  Plaintiff further

---

[8] Though Plaintiff may not be able to establish claim under the EPA, this does not
necessarily toll the death knell for her claim under Title VII.  As is evident from the application
of different frameworks for analyzing EPA and Title VII disparate pay claims, the burdens of
proof are different under the two laws.  *Miranda*, 975 F.3d at 1526.  The most notable distinction
between the two claims is that under Title VII examination there is a relaxed standard of
similarity between male and female-occupied jobs.  *Id*.  However, Plaintiff is saddled with the
burden of proving intent to discriminate on the basis of sex.  *Id*.

asserts that the alleged chauvinistic and discriminatory behavior of Anderson and other male employees indicates DAC's predilection for favoring male employees both in treatment and pay. As we have already noted, even construing all testimony regarding the behavior of DAC's male employees in a light most favorable to Plaintiff, none of it indicates a preference for compensating men at a higher wage. Though Plaintiff submits much data on the wage rates of all Account Executives at DAC, the Court again notes that the issue before us is whether *Plaintiff Darring* was discriminated against by being paid a lower salary than an equally positioned male employee. Furthermore, Plaintiff asserts that she was more qualified than Bernardo. Though she did have prior experience with the Legg Mason account, she cannot rebut the fact that Bernardo had both higher academic achievement and a financial background. Based on the above information, the Court cannot find that Plaintiff has satisfied her burden of demonstrating a genuine issue of material fact as to the propriety of DAC's proffered legitimate and nondiscriminatory reason for the pay disparity between herself and Bernardo. Therefore, DAC's Motion for Summary Judgment as to Darring's claim of disparate treatment in pay in violation of Title VII is **due to be GRANTED**.

### V.    *Motions to Strike*

"A district court, in considering a summary judgment motion, has an obligation to consider all admissible evidence, including admissible affidavits." Based on Fed.R.Evid. 701, such testimony by lay witnesses "is admissible if it is (1) rationally based on his own perceptions and (2) helpful to a clearer understanding of the plaintiff's case." *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1334 (11th Cir. 1988). In the instant case, Plaintiffs proffer the affidavits of Theresa Brewton, Karen Darring, Amy James and Patricia Duke in support of their Brief in Opposition to Defendant's Motion for Summary Judgment. Defendant objects to these affidavits and has motioned the Court to strike them in their entirety. Defendant's Motion to Strike is **due to be DENIED**.

Defendant cites a litany of reasons as to why various portions of each affidavit should stricken.  The Court, however, declines to engage in a discussion as to each of these specific objections.  This does not mean that the Court has relied on all of or any of the testimony in question.  Rather, the Court simply notes that we are fully capable of examining evidentiary testimony and weighing its propriety.  Such testimony that is contradictory, irrelevant or inadmissible has been discounted and not relied upon in this decision.  Therefore, the Court **hereby DENIES** Defendant's Motion to Strike any or all of the affidavits in their entirety.

**CONCLUSION**

Based on the above analysis, this Court finds that Defendant's Motion (Doc. 32) for Summary Judgment is **due to be and hereby GRANTED in Part and DENIED in Part**.  As to Plaintiff Brewton's claim of Retaliation in violation of the FMLA, the Court finds Defendant's Motion for Summary Judgment to be **hereby DENIED**.  As to all other claims asserted by Plaintiffs Darring and Brewton, the Court finds Defendant's Motion for Summary Judgment to be **hereby GRANTED**.  In addition, Defendants Motion (Doc. 45) to Strike the Affidavits of Karen Darring, Theresa Brewton, Patricia Duke and Amy James to be hereby **DENIED**.

**So ORDERED**, this 27th day of March, 2006.


s/ W. B. Hand
SENIOR DISTRICT JUDGE